## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

DANIEL SILBERMAN, and
MATTHEW BARKUS individually
and on behalf of all others similarly
situated,

      Plaintiffs,

      v.

FORD MOTOR COMPANY,

      Defendant.

Case No.:


**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of all others similarly situated (the "Class," as more fully defined below), hereby allege against the Defendant, Ford Motor Company ("Ford" or "Defendant"), upon personal knowledge as to themselves and their own respective acts, and as to all other matters upon information and belief, and based upon the investigation made by the undersigned counsel, as follows:

### I.    NATURE OF THE CASE

1.    Plaintiffs seek damages and equitable relief, individually and on behalf of all other Class Members, for Ford's sale and lease of Class Vehicles that suffer from a structural defect in their valvetrains that makes the vehicles susceptible to catastrophic engine failure, exposing occupants to great risk of bodily harm.

2.     The Class Vehicles, as that term is used herein, are certain Ford vehicles equipped with 2.7L or 3.0L "EcoBoost" engines containing intake valves made out of "Silchrome Lite." Vehicles equipped with such engines include: the Ford Bronco (model year 2022); the Ford F-150 (model year 2021-2022); the Ford Edge (model year 2021-2022); the Lincoln Nautilus (model year 2021-2022); the Ford Explorer (model year 2021-2022); and the Lincoln Aviator (model year 2021-2022).

3.     Lurking inside the engines of the Class Vehicles are intake valves manufactured out of an alloy known as "Silchrome Lite," a material that becomes excessively hard and brittle if exposed to over-temperatures during the machining of the component.

4.     These structurally-compromised intake valves cannot withstand the pressures placed upon them and risk fracturing (the "Valvetrain Defect" or "Defect").

5.     When this occurs, the consequence can be sudden, catastrophic engine failure and a loss of motive power. In the aftermath of such an event, the only repair available is a full engine replacement.

6.     If the Valvetrain Defect causes catastrophic engine failure during high-velocity driving, this poses a high risk of injury not just to the driver of the vehicle, and any passengers, but also to those in the immediate surrounding area who have to contend with a speeding hunk of metal whose driver has lost control.

7.     Ford stopped manufacturing valves made out of "Silchrome Lite" in October 2021, opting instead for a different, more resilient alloy that is less prone to fracture.

8.     Consumers began to experience vehicle failure as a result of the Valvetrain Defect soon after purchasing their Class Vehicles.

9.     As early as March 2022, consumers sent letters to the Office of Defects Investigation (ODI) at the National Highway Traffic Safety Administration (NHTSA) complaining about the defect, raising questions about the integrity of the Ford Bronco, and requesting an investigation.

10.     The ODI then opened a formal investigation into the matter on July 22, 2022, after identifying 26 complaints alleging catastrophic engine failure and the sudden loss of motive power at highway speeds in affected vehicles.

11.     Despite Ford's longstanding knowledge as to the discrete cause of the Defect, as evidenced by its purposeful decision to alter its manufacturing processes and stop using "Silchrome Lite," Ford has yet to provide an adequate remedy, such as a replacement of their defective valves, or compensate consumers for the amount they overpaid for these defective vehicles.

12.     Ford's failure to remedy the Defect, where, as here, the consequences of the Defect are potentially enormous and place drivers and their passengers at an unacceptably high risk of bodily injury.

13.     Each purchaser or lessee of a Class Vehicle unwittingly paid for a vehicle with an undisclosed and significant safety defect. Each of these purchasers and lessees were damaged in that they paid more for their Class Vehicles than they would have paid had they known about the Valvetrain Defect or in that they would not have purchased or leased their Class Vehicles at all had they been informed of the Defect.

## II.     JURISDICTION AND VENUE

14.     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiffs and one or more of the other Class Members are citizens of a different state than Defendant.

15.     This Court has personal jurisdiction over Ford because it is a Michigan corporation with its corporate headquarters located in this district.

16.     Additionally, Ford has purposefully availed itself of the privilege of conducting business in the State of Michigan by advertising and selling its manufactured vehicles (including the Class Vehicles) within the State's boundaries, providing another basis for personal jurisdiction.

17.     Venue is proper in this District under 28 U.S.C. § 1391 because Ford resides within this district and a substantial part of the events giving rise to Plaintiffs' claims occurred within this district.

## III.   PARTIES

**A.   Plaintiffs**

**a) Matthew Barkus**

18.     Matthew Barkus is domiciled in Southampton, Pennsylvania.   Mr. Barkus may be later referred to as the "Pennsylvania Plaintiff."

19.     Mr. Barkus owns a 2021 Ford F-150 equipped with a 2.7L EcoBoost engine.

20.     Mr. Barkus' vehicle was manufactured before October 2021.

21.     Mr. Barkus purchased his vehicle certified pre-owned from Fred Beans Ford, an authorized Ford dealership in Newtown, PA.

22.     Before purchasing his vehicle, Mr. Barkus reviewed Ford's website, as well as other materials such as the dealership website, a Carfax report, and various videos and articles about the Ford F-150 vehicle.   He also spoke with a sales representative and reviewed the Monroney sticker before taking possession of the car.

23.     Ford did not disclose the Valvetrain Defect through any of the above-described avenues that Mr. Barkus reviewed before purchasing his vehicle.

24.     Ford failed to disclose the Valvetrain Defect to Mr. Barkus before he purchased his vehicle, despite Ford's knowledge of the Defect, and Mr. Barkus thus purchased his vehicle with the incorrect understanding that it would be a safe and reliable vehicle.

25.     Had Ford disclosed the Valvetrain Defect, Mr. Barkus would not have purchased his vehicle, or certainly would have paid less for it.

26.     Ford issued a limited recall concerning the Valvetrain Defect, but it only covers a small fraction of the affected vehicles.  Mr. Barkus' vehicle is not the subject of a relevant recall and he has not received any notice of an upcoming relevant recall.

27.     Mr. Barkus intends to buy or lease new vehicles again in the future and would consider another Ford vehicle equipped with an EcoBoost engine, but is concerned that Ford would again conceal a known defect affecting that engine.  An injunction requiring Ford to take remedial steps with respect to the Valvetrain Defect would therefore benefit Plaintiff. An injunction also would benefit the Class Members who still possess their vehicles by alleviating the danger that the Valvetrain Defect poses whenever they operate their vehicles.

28.     Mr. Barkus has no past or present financial, employment, familial, or other relationship with any of the attorneys in this action that would create a conflict of interest with the proposed Class Members.

**b) Dan Silberman**

29.     Dan Silberman is domiciled in Holtsville, New York. Mr. Silberman may be later referred to as the "New York Plaintiff."

30.     Mr. Silberman owns a 2021 Ford Bronco equipped with a 2.7L EcoBoost engine.

31.     Mr. Silberman's vehicle was manufactured before October 2021.

32.     He purchased his Ford Bronco new from Sayville Ford, a Ford dealership in Sayville, New York.

33.     Before purchasing his Ford Bronco, Mr. Silberman saw commercials for the vehicle that promoted the vehicle's reliability and durability and he also spoke with a sales representative.   Mr. Silberman also reviewed and relied on the information in the Monroney sticker on the vehicle before purchasing and taking possession of the vehicle.

34.     Ford did not disclose the Valvetrain Defect through any of the above-described avenues that Mr. Silberman reviewed before purchasing his vehicle.

35.     Ford failed to disclose the Valvetrain Defect to Mr. Silberman before he purchased his vehicle, despite Ford's knowledge of the Defect, and Mr. Silberman thus purchased his vehicle with the incorrect understanding that it would be a safe and reliable vehicle.

36.     Had Ford disclosed the Valvetrain Defect, Mr. Silberman would not have purchased his vehicle, or certainly would have paid less for it.

37.     Ford issued a limited recall concerning the Valvetrain Defect, but it only covers a small fraction of the affected vehicles.  Mr. Silberman's vehicle is not

the subject of a relevant recall and he has not received any notice of an upcoming relevant recall.

38.     Mr. Silberman intends to buy or lease new vehicles again in the future and would consider another Ford vehicle equipped with an EcoBoost engine, but is concerned that Ford would again conceal a known defect affecting that engine.  An injunction requiring Ford to take remedial steps with respect to the Valvetrain Defect would therefore benefit Plaintiff. An injunction also would benefit the Class Members who still possess their vehicles by alleviating the danger that the Valvetrain Defect poses whenever they operate their vehicles.

39.     Mr. Silberman has no past or present financial, employment, familial, or other relationship with any of the attorneys in this action that would create a conflict of interest with the proposed Class Members.

**B.     Defendant**

40.     Defendant Ford Motor Company is a corporation organized under the laws of the State of Delaware and headquartered in Dearborn, Michigan.

41.     Ford is responsible for the manufacturing, sales, marketing, service, distribution, import, and export of the Class Vehicles. Ford is also the warrantor and distributor of Ford vehicles, including the Class Vehicles, throughout the United States.

42.     Ford developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Class Vehicles.

43.     Ford is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor Defendant. Consumers are not given a meaningful choice in the terms of the warranties provided by Defendant, and those warranties are offered on a "take it or leave it" basis.

44.     Ford was provided with timely pre-suit notice on behalf of all Class Members before this action was filed.

## IV.   FACTUAL ALLEGATIONS

### A.    Nature of the Defect

45.     Each of the Class Vehicles are equipped with either a 2.7L or a 3.0L EcoBoost engine containing intake valves made out of "Silchrome Lite."

46.     In simple terms, the function of an intake valve is to regulate the flow of the mixture of fuel and air that is drawn into an engine's cylinder for combustion.

47.     To perform this vital function, the valves must be able to withstand the extreme conditions of the combustion chamber.

48.     If they are not fixed promptly, broken valves can seriously damage the overall integrity of the engine and its performance.

49.     Due to a loss of compression, the engine of a vehicle with compromised intake valves will sputter and misfire when the vehicle is in motion. If the valve fully breaks apart, its component pieces can then get sucked into the combustion chamber itself, causing irreversible damage to the pistons and cylinder heads.

50.     The intake valves in the Class Vehicles are composed of "Silchrome Lite," a compromised material that cannot withstand the intense pressures foisted upon intake valves during the regular operation of the vehicle—the Valvetrain Defect.

51.     If not remedied immediately, these structural infirmities in the intake valves will give way to stress fractures, resulting in sudden and catastrophic engine damage.

52.     The Defect at issue is a defect in materials, workmanship, and/or design.  Each form of defect is alleged in the alternative.

**B.     NHTSA Investigation**

53.     In March 2022, aggrieved consumers penned a series of letters petitioning NHTSA to launch a defect investigation into Ford for problems stemming from the 2.7L EcoBoost engine.

54.     The first of these letters was dated March 17, 2022,[1] the second was dated March 18, 2022,[2] and the final letter was dated March 29, 2022[3].

55.     The letters each contained substantially similar allegations, namely that (1) the 2021 Ford Bronco suffered from a known defect that causes catastrophic engine failure, (2) Ford was aware of the defect as evidenced by internal documents, (3) Ford has not communicated with owners about the defect, which poses major safety issues, (4) 35 people have filed complaints about the issue on NHTSA's website, and (5) there was an urgent need for a recall to prevent serious injury.

56.     According to the author of the first letter, the Valvetrain Defect posed:

a major safety issue in that the catastrophic engine failure has already left hundreds of people stranded on roadways nationwide. Some have barely avoided major injury when their vehicles have had complete power loss at freeway speeds in traffic, others in the middle of busy intersection with no ability to get out of harms way, and still others have been stranded for hours in freezing conditions waiting for help.

57.     The author further noted that Ford was aware of the Defect:

Ford needs to recall the affected units immediately for proactive replacement of the parts causing the total failure of this engine. They have clearly acknowledged the problem by stopping production and implementing a change to this engine before resuming production. In fact, an internal Ford memo documents these changes. It appears as if all 2.7L EcoBoost engines build and installed in the 2021 Ford Bronco built between May 2021 and November 2021 are affected by these failures.

---

[1] Ex. 1, https://static.nhtsa.gov/complaints/11461178/11461178-0002.pdf.

[2] Ex. 2, https://static.nhtsa.gov/complaints/11460125/11460125-0002.pdf.

[3] Ex. 3, https://static.nhtsa.gov/complaints/11460124/11460124-0002.pdf.

58.     The author concluded his letter by pleading with federal authorities to get involved: "Please initiate an investigation into this known defect so that we may prevent serious injury or possible death."

59.     Shortly after receiving this trio of letters, on May 27, 2022, the ODI opened a Defect Petition to evaluate whether to grant or deny the petitioners' request to investigate the Ford Bronco.[4]

60.     On July 22, 2022, ODI elected to proceed and opened an investigation (or "Preliminary Evaluation") into the 2021 Ford Bronco. The "Problem Description" was as follows: "Under normal driving conditions without warning the vehicle may experience a loss of motive power without restart due to the catastrophic engine failure related to an alleged fault valve within 2.7 L Eco-Boost Engines."[5]

61.     The purpose of the investigation was to "assess the scope, frequency, and potential safety-related consequences of the alleged defect."[6]

62.     The problem would prove to be worse and more widespread than originally anticipated.

63.     As ODI explained in its subsequent statement released on September 29, 2023, where it authorized a full-scale engineering analysis into the Defect, ODI's

---

[4] Ex. 4, https://static.nhtsa.gov/odi/inv/2022/INOA-DP22001-4273.PDF.

[5] Ex. 5, https://static.nhtsa.gov/odi/inv/2022/INOA-PE22007-7888.PDF.

[6] Ex. 6, https://static.nhtsa.gov/odi/inv/2023/INOA-EA23002-10790.pdf.

preliminary evaluation had revealed that the alleged Defect also affected vehicles equipped with 3.0L EcoBoost engines.[7]

64.    In other words, this Defect was not limited to the 2021 Ford Bronco, as alleged in the initial petition letters, but it also affected a much wider range of models. ODI estimated the total number of affected vehicles was 708,837. [8]

65.    ODI observed the following about the root cause of the Defect:

During the investigation, multiple contributing factors were identified which can lead to the fracturing of the intake valves in the subject engines. Ford acknowledged that a fractured intake valve can result in catastrophic engine failure and a loss of motive power and noted that following a valve fracture, a vehicle typically requires a full engine replacement. Ford advised ODI that the defective valves were manufactured out of a specific alloy known as "Silchrome Lite", which can become excessively hard and brittle if an over-temperature condition occurs during machining of the component. . . . Ford has identified that the defective intake valves commonly fail early in a vehicle's life and has suggested that the majority of failures have already occurred.[9]

66.    To date, Ford has yet to declare a recall targeting all class vehicles affected by the Valvetrain Defect.

## C.    Ford Is on Notice of the Defect

67.    Ford knew about the Valvetrain Defect when it sold Plaintiffs their vehicles. Such knowledge can be imputed from Ford's field-testing procedures, its

---

[7] *Id.*

[8] *Id.*

[9] *Id*.

purposeful decision to stop makings its valves out of "Silchrome Lite," and its presumed compliance with the TREAD Act, an expansive federal law that requires, among other things, for vehicle manufacturers to track vehicles' diagnoses and repairs for alleged defects in a single, aggregated database. 49 U.S.C. § 30166(m)(3)(A)(West).

68.    Like all major vehicle manufacturers, Ford performs comprehensive field testing on its vehicles before the company releases vehicles on the consumer market. Considering that this Defect can manifest early in the lifespan of the affected vehicles, standard, pre-release field testing would have alerted Ford engineers to the existence of the Valvetrain Defect. However, Ford failed to act on this knowledge. Instead of delaying the release of the Class Vehicles until its engineers could get to the bottom of the Defect, Ford instead proceeded full steam ahead with the rollout, releasing vehicles into the stream of commerce that it knew contained brittle intake valves suffering from the Defect.

69.    Ford subsequently marketed and sold these vehicles to unsuspecting consumers without disclosing the safety risk or warning to Class Members. In making this series of decisions, Ford placed its own interests ahead of those of consumers.

70.    Further, Ford purposefully stopped using "Silchrome Lite" as early as October 2021. This "design modification," as explained in the ODI materials,

"changed the intake valve material to a different alloy known as "Silchrome 1," that is less susceptible to over-temperature during machine grinding."[10]  However, the fact that Ford implemented design modifications and stopped using Silchrome Lite in October 2021 is evidence that Ford knew there was a problem when Plaintiffs purchased their vehicles.  At the same time that Ford was advertising and selling vehicles with the EcoBoost engine, behind the scenes, Ford was quietly developing changes to address a known problem – the Valvetrain Defect.

71.    Ford was also put on notice about the Defect's existence from consumer complaints who were presenting their vehicles to dealerships for repair due to sudden loss of motive power. Pursuant to its obligations under the TREAD Act, Ford had to meticulously document and aggregate these types of consumer-driven field reports and the accompanying warranty data they produced. Indeed, Ford, like any major vehicle manufacturer, likely has compliance officers whose entire job is to make sure the company complies with its "early warning" reporting obligations under the TREAD Act.[11]

---

[10] *Id.*

[11] Of the major American car manufacturers, Ford is perhaps uniquely aware of the duties imposed upon it by the TREAD Act. Ford was responsible for the passage of the TREAD Act. Congress passed the sweeping law in 2000 largely in response to anger at Ford's failure to notify NHTSA of numerous tire-related safety campaigns conducted in overseas markets related to the Ford Explorer. *See* Kevin M. McDonald, *Don't Tread on Me: Faster Than A Tire Blowout, Congress Passes*

72.    In addition to the warranty data produced by customers bringing in their defective vehicles for repair, Ford was also put on notice about the Defect through NHTSA complaints.

73.    As ODI noted in its statement on July 22, 2022, when it opened a preliminary investigation into the 2021 Ford Bronco, numerous complaints were posted to NHTSA.gov documenting the Valvetrain Defect.[12]

74.    For every complaint that a consumer files with NHTSA, a car manufacturer likely receives hundreds, or even thousands, of related warranty claims.[13]

75.    All safety complaints made to NHTSA are transmitted or made available to Ford, who monitors them as part of Ford's online reputation management efforts and/or to identify potential defects in its vehicles.  Monitoring

---

*Wide-Sweeping Legislation That Treads on the Thirty-Five Year Old Motor Vehicle Safety Act*, 49 Buff. L. Rev. 1163, 1163 (2001).

[12] Ex. 5, https://static.nhtsa.gov/odi/inv/2022/INOA-PE22007-7888.PDF. ODI specifically referenced the following NHTSA complaints: 11448171, 11448461, 11450659, 11450702, 11450737, 11450788, 11450871, 11450879, 11451158, 11451503, 11451957, 11452074, 11452692, 11453669, 11453933, 11454098, 11455294, 11456219, 11456713, 11459262,11460124, 11460125, 11461178, 11463199, 11463296, and 11464516.

[13] For comparison, in a different case involving Honda, Honda, as is mandated by federal regulations, prepared a section 573.6(b)(6) report for NHTSA detailing the history of its investigation into a potential defect. *See* https://static.nhtsa.gov/odi/rcl/2017/RMISC-17V418-5009.pdf. In that report, Honda noted that a potential defect involving a "thermal event" was suspected in some 3,826 warranty claims, even though "zero field reports" were reported.

complaints to NHTSA is standard industry practice that serves as an early warning mechanism to spot defects that cause safety hazards. Ford adheres to this practice.

76.    The number of complaints for all Class Vehicles was unusually high relative to the total population of vehicles sold or leased. The fact that so many drivers made similar complaints indicated that the complaints were not the result of user error or anomalous incidents, but instead a systemic problem with the Class Vehicles.  The reports and complaints from drivers were similar enough to put Ford on notice that the incidents described were the result of a Valvetrain Defect, and that the Class Vehicles were experiencing unusually high levels of complaints about that Defect.

77.    Through monitoring warranty data and NHTSA activity—which is required to be in full compliance with the TREAD Act—Ford knew with certainty, or should have known, that the Defect would manifest soon after the rollout of the 2020 Ford Explorer, well before it sold defective vehicle to Plaintiffs.

78.    The Valvetrain Defect, by stripping vehicles of their motive power—a catastrophic failure that can occur at any moment, including during highway driving—poses an unreasonable safety hazard.

79.    This Defect is not the equivalent of a broken CD player; it is a problem that makes these Class Vehicles fundamentally unfit to drive unless and until the faulty, brittle valves are replaced.

80.     Discovery will show that Ford unlawfully failed to disclose the Defect to induce Plaintiffs and other Class Members to purchase or lease the Class Vehicles.

81.     Ford engaged in deceptive acts or practices in Plaintiffs' and Class Members' purchases or leases of Class Vehicles.

82.     Plaintiffs and the Class paid more money for their vehicles than they would have had they been adequately informed about the Valvetrain Defect.

83.     Ford unlawfully induced Plaintiffs and Class Members to purchase or lease their Class Vehicles by concealing a material fact (the Defect), and Plaintiffs and Class Members would have paid less for the Class Vehicle, or not purchased it at all, had they known of the Defect.

84.     Plaintiffs and each of the Class Members are the intended beneficiaries of the express and implied warranties that accompany each Class Vehicle. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Ford. These warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

85.     Ford issued the express warranty to Plaintiffs and the Class Members. Ford also developed and disseminated the owner's manuals and warranty booklets that direct consumers to take their vehicles to authorized dealerships for diagnosis

and repair. Ford also developed and disseminated the advertisements, such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles, which promoted the terms of the warranties that they issue with the sale of each Class Vehicle. Because Ford issues the express warranties directly to consumers, Plaintiffs and Class Members are in direct privity with Ford with respect to the warranties.

86.    Had Ford disclosed the Valvetrain Defect, Plaintiffs and the other Class Members would not have purchased their Class vehicles, or would have paid less for them. Simply put, Plaintiffs and the other Class Members did not get what they paid for.

87.    Instead, Ford had exclusive knowledge of the Valvetrain Defect prior to Plaintiffs purchasing their vehicles, and Ford did not inform consumers (or dealerships) of the Valvetrain Defect, but could have done so through advertising or on Ford's website, communication of information to dealerships to relay to consumers, written disclosures, etc. Instead, as detailed herein, Ford manufactured vehicles with the Camera Defect and fraudulently omitted this information from consumers at the point of sale.

88.    Ford had a duty to disclose the Defect because it involves an unreasonable safety risk.   Ford also had a duty because it made partial

representations about the benefits and features of the EcoBoost engine, without disclosing the safety hazard associated with the Defect.

## V.      TOLLING OF THE STATUTE OF LIMITATIONS

### A.      Discovery Rule Tolling

89.     Plaintiffs and the other Class Members could not have discovered through the exercise of reasonable diligence that their Class Vehicle were defective within the time period of any applicable statutes of limitation.

90.     Neither Plaintiffs nor the other Class Members knew or could have known of the Valvetrain Defect in their Class Vehicles, at least until after the ODI Report was publicly issued.

### B.      Fraudulent Concealment Tolling

91.     Throughout the time period relevant to this action, Ford concealed from and failed to disclose to Plaintiffs and the other Class Members vital information about the Valvetrain Defect described herein.

92.     Indeed, Ford kept Plaintiffs and the other Class Members ignorant of vital information essential to the pursuit of their claims.  As a result, neither Plaintiffs nor the other Class Members could have discovered the defect, even upon reasonable exercise of diligence.

93.     Specifically, since at least October 2021, when it altered its manufacturing processes and stopped using "Silchrome Lite," Ford has been aware about the Valvetrain Defect.

94.     Despite its knowledge of the Defect, Ford failed to disclose and concealed this critical information from Plaintiffs and the other Class Members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

95.     Plaintiffs and the other Class Members justifiably relied on Ford to disclose the Valvetrain Defect in the Class Vehicles that they purchased or leased, because that defect was hidden and not discoverable through reasonable efforts by Plaintiffs and the other Class Members.

96.     Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class Members have sustained as a result of the defect, by virtue of the fraudulent concealment doctrine.

**C.     Estoppel**

97.     Ford was under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the Class Vehicles.

98.     Ford knowingly concealed the true nature, quality, and character of the Class Vehicles.

99.   Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VI.   CLASS ACTION ALLEGATIONS

100.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

101.   Plaintiffs seek to represent the following Classes:

**Nationwide Class**
*All persons who purchased or leased a Class Vehicle (as defined herein) that was purchased or leased in the United States.*

**Multi-State Consumer Protection Class**
*All persons who purchased or leased a Class Vehicle (as defined herein): (1) in the states of Michigan, Minnesota, or New Jersey within the applicable statute of limitations; (2) in the state Missouri within the applicable statute of limitations; (3) in the states of California, Florida, Massachusetts, or Washington within the applicable statute of limitations; (4) in the states of Illinois and New York within the applicable statute of limitations.*

**New York Class**
*All persons who purchased or leased a Class Vehicle (as defined herein) that was purchased or leased in the State of New York.*

**Pennsylvania Class**
*All persons who purchased or leased a Class Vehicle (as defined herein) that was purchased or leased in the State of Pennsylvania.*

102.   Excluded from the Classes is the Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.

103.   Each of the above class definitions is a placeholder that "may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C).  Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation, including through the use of multi-state subclasses to account for material variations in law, if any.

104.   This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

105.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**.   The members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable.  While Plaintiffs are informed and believe that there are thousands of Class Members, the precise number of Class Members is unknown to Plaintiffs but may be ascertained from Ford's books and records.  Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

106.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**.  This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

    a.  whether Ford engaged in the conduct alleged herein;

    b.  whether Ford's alleged conduct violates applicable law;

    c.  whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

    d.  whether Ford misled Class Members about the quality of the Class Vehicles;

    e.  whether the Class Vehicle contain the Valvetrain Defect;

    f.  whether Ford had actual or imputed knowledge about the alleged defect but failed to disclose it to Plaintiffs and the other Class Members;

    g.  whether Ford's omissions and concealment regarding the quality of the Class Vehicles were deceptive in violation of the consumer protection laws of New York and Pennsylvania;

    h.  whether Ford breached its express warranty to the Class Members with respect to the Class Vehicles;

i. whether Class Members overpaid for their Class Vehicles as a result of the defect alleged herein;

j. whether Class Members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

k. the amount and nature of relief to be awarded to Plaintiffs and the other Class Members.

107. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class Members' claims because Plaintiffs and the other Class Members purchased or leased Class Vehicles. Neither Plaintiffs nor the other Class Members would have purchased the Class Vehicles, or would have paid less for the Class Vehicles, had they known of the Valvetrain Defect in the Class Vehicles. Plaintiffs and the other Class Members suffered damages as a direct proximate result of the same wrongful practices in which Ford engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class Members.

108. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class that they seek to represent, Plaintiffs have retained counsel competent and experienced in complex

class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

109. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members as a whole.

110. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the Class Members to individually seek redress for Ford's wrongful conduct. Even if the Class Members could afford litigation the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer

management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF
### COUNT I
**Violation of the Pennsylvania Trade Practices and Consumer Protection Law
73 Pa. Cons. Stat. §§ 201-1, et seq.**

111.   Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

112.   The Pennsylvania Plaintiff (referred to simply as "Plaintiff" in the remainder of this count) brings this Count individually and on behalf of the other members of the Pennsylvania Class.

113.   Defendant's practices, acts, policies and course of conduct, as described above, constitute unfair conduct because they (1) offend public policy; (2) are immoral, unethical, oppressive and unscrupulous; and (3) cause substantial injury to consumers in violation of the Pennsylvania Trade Practices and Consumer Protection Law ("UTPCPL").   Defendant, concealed, suppressed and omitted to Plaintiff and the other Class Members at the time of purchase or lease, that the Class Vehicles suffered from the Defect at issue in this case. Plaintiff and the other Class Members would not have bought the vehicles, or would have paid less for them, if Defendant had disclosed the Defect at issue in this case.

114.   Defendant knew about the Defect, but did not correct it or disclose it to Plaintiff or the other Class Members.

27

115.   Defendant's concealment and omissions were material.

116.   Defendant's concealment and omissions occurred in the course of conduct involving trade or commerce. Defendant's conduct caused Plaintiff and the other Class Members to suffer ascertainable losses of money and property in that they were misled into expending additional sums of money at its dealerships and elsewhere in the purchase or lease of the Class Vehicles after having been misled about the presence of Defect at issue in this case. Defendant did so despite having prior knowledge of the Defect when it placed said vehicles into the stream of commerce. Plaintiff also seeks a declaration that Class Vehicles are defective, and owners and lessees of the Class Vehicles must be compensated, refunded, and/or have their vehicles replaced with others that do not suffer from the Defect.

117.   Plaintiff seeks all available relief under this cause of action.

## COUNT II
### Breach of the Implied Warranty of Merchantability
### 13 Pa. Cons. Stat. §§ 2314 and 2A212

118.   Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

119.   The Pennsylvania Plaintiff (referred to simply as "Plaintiff" in the remainder of this count) brings this Count individually and on behalf of the other members of the Pennsylvania Class.

120.   Ford is and was at all relevant times a "merchant" with respect to motor

vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(b), and a "seller" of motor vehicles under § 2103(a).

121.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

122.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

123.   Under 13 Pa. Cons. Stat. Ann. §§ 2314 & 2A212, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other Pennsylvania Class Members purchased or leased their Class Vehicles from Ford.

124.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

125.   Ford marketed the Class Vehicles as safe, reliable, and high-quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and Pennsylvania Class Members' decisions to purchase or lease the Class Vehicles.

126.   Even though privity is not required or a third-party beneficiary exception exists, Plaintiff and Pennsylvania Class Members are in privity with Ford because Ford marketed the Class Vehicles to Plaintiff and Pennsylvania Class

Members, and Plaintiff and Pennsylvania Class Members were the intended users of the vehicles.

127.   Ford knew or had reason to know of the specific use for which Plaintiff and Pennsylvania Class Members purchased their Class Vehicles.

128.   Because of the Valvetrain Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

129.   Ford knew about the defect in the Class Vehicles, allowing Ford to cure their breach of warranty if it chose to do so.

130.   Plaintiff and Pennsylvania Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations because of Ford's conduct described herein. Affording Ford a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

131.   Ford was provided notice of the Valvetrain Defect through numerous complaints filed against it directly and through its dealers.

132.   Notice can be further imputed from Ford's decision to alter its manufacturing processes.

133.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Pennsylvania Class have been

damaged in an amount to be proven at trial.

## COUNT III
### Breach of Express Warranty
### 13 Pa. Cons. Stat. §§ 2313 and 2A210

134.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

135.    The Pennsylvania Plaintiff (referred to simply as "Plaintiff" in the remainder of this count) brings this Count individually and on behalf of the other members of the Pennsylvania Class.

136.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(b), and a "seller" of motor vehicles under § 2103(a).

137.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

138.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

139.    In its warranty, Ford expressly warranted that it would repair or replace any part that is defective in material or workmanship under normal use.

140.    The Ford Warranty further states that all repairs/replacements made under the warranty are free of charge.

31

141.   Ford's Warranty formed the basis of the bargain that was reached when Plaintiff and the other Pennsylvania Class Members purchased or leased their Class Vehicles with the Valvetrain Defect.

142.   Ford breached the express warranty to repair parts defective in material or workmanship by failing to repair the Valvetrain Defect.

143.   Ford has not repaired, and has been unable to repair, the Valvetrain Defect in Plaintiff's Class Vehicle and the Class Vehicles of the other Pennsylvania Class Members.

144.   Ford was provided notice of the Valvetrain Defect through numerous complaints filed against it directly and through its dealers.

145.   Notice can be further imputed from Ford's decision to alter its manufacturing processes.

146.   The Ford Warranty therefore fails in its essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiff and the other Pennsylvania Class Members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

147.   Any attempt to present the Class Vehicles for repair would have been futile because any ensuing repair would have been inadequate, based on Ford's demonstrated inability or refusal to make effective repairs.

148.   Accordingly, recovery by Plaintiff and the other Pennsylvania Class Members is not limited to the limited warranty of repair/replacement, and Plaintiff, individually and on behalf of the other Pennsylvania Class Members, seeks all remedies as allowed by law.

149.   Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Ford improperly concealed material facts regarding its Class Vehicles.   Plaintiff and the other Pennsylvania Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

150.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Ford's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Pennsylvania Class Members' remedies would be insufficient to make Plaintiff and the other Pennsylvania Class Members whole.

151.   As a direct and proximate result of Ford's breach of express warranty, Plaintiff and the other Pennsylvania Class Members have been damaged in an amount to be determined at trial.

152.   Plaintiff seeks all available relief under this cause of action.

## COUNT IV
## Violations of New York General Business Law § 349

153.   Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

154.   The New York Plaintiff (referred to simply as "Plaintiff" in the remainder of this count) brings this Count individually and on behalf of the other members of the New York Class and Multi-State Consumer Protection Class.

155.   GBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

156.   In its sale of goods throughout the State of New York, Defendant conducts business and trade within the meaning and intendment of GBL § 349.

157.   Plaintiff and the New York Class Members are consumers who purchased vehicles for their personal use.

158.   By the acts and conduct alleged herein, Defendant has engaged in deceptive, unfair, and misleading acts and practices, as alleged above. If Plaintiff and the New York Class Members been told of these facts, they would not have purchased the subject vehicles, or would have paid less for them.

159.   The foregoing deceptive acts and practices were directed at consumers.

160.   The foregoing deceptive acts and practices are misleading in a material way. A reasonable consumer would not have knowingly purchased the subject

vehicles if they had been truthfully advertised, or they would not have paid the price premium associated with the products. By reason of this conduct, Defendant engaged in deceptive conduct in violation of GBL § 349.

161.   Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff and the New York Class Members have sustained from having paid for and used the subject vehicles.

162.   As a result of Defendant's violations, Plaintiff and the New York Class Members have suffered damages because: (a) they paid a premium price based on Defendant's deceptive conduct; and (b) the vehicles are unsafe and do not have the characteristics, uses, benefits, or qualities as promised.

163.   On behalf of themselves and other members of New York Class Members, Plaintiff seeks to recover seeks all available relief for claims pursued under GBL § 349.

## COUNT V

### Violations of New York General Business Law § 350

164.   Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

165.   The New York Plaintiff (referred to simply as "Plaintiff" in the remainder of this count) brings this Count individually and on behalf of the other members of the New York Class and Multi-State Consumer Protection Class.

166.   GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce. Pursuant to § 350, false advertising is defined as "advertising, including labeling, of a commodity ... if such advertising is misleading in a material respect."

167.   In its sale of goods throughout the State of New York, Defendant conducts business and trade within the meaning and intendment of GBL § 350.

168.   Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of GBL § 350.

169.   Plaintiff and the New York Class Members are consumers who purchased products from Defendant for their personal use.

170.   By the acts and conduct alleged herein, Defendant has engaged in deceptive, unfair, and misleading acts and practices, as alleged above.  Had Plaintiff and the New York Class Members been apprised of these facts, they would not have purchased the subject vehicles.

171.   The foregoing deceptive acts and practices were directed at consumers.

172.   The foregoing deceptive acts and practices are misleading in a material way. A reasonable consumer would not have knowingly purchased the subject vehicles if the products had been truthfully advertised, or they would not have paid

the price premium associated with the products. By reason of this conduct, Defendant engaged in deceptive conduct in violation of GBL § 350.

173. Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff and the New York Class Members have sustained from having paid for and used the subject vehicles.

174. As a result of Defendant's violations, Plaintiff and the New York Class Members have suffered damages because: (a) they paid a premium price based on Defendant's deceptive conduct; and (b) the subject vehicles are unsafe and do not have the characteristics, uses, benefits, or qualities as promised.

175. On behalf of themselves and other members of New York Class Members, Plaintiff seeks all available relief for claims pursued under GBL § 350.

**COUNT VI**
**Breach of the Implied Warranty of Merchantability**
**N.Y. U.C.C. §§ 2-314 and 2-A-212**

176. Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

177. The New York Plaintiff (referred to simply as "Plaintiff" in the remainder of this count) brings this Count individually and on behalf of the other members of the New York Class.

178.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. U.C.C. §§ 2-104(1) and 2-A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

179.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.Y. U.C.C. § 2-A-103(1)(p).

180.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. § § 2-105(1) and 2-A-103(1)(h).

181.   Under N.Y. UCC §§ 2-314 and 2-A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the other New York Class Members purchased or leased their Class Vehicles from Ford.

182.   The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

183.   Ford marketed the Class Vehicles as safe, reliable, and high-quality automobiles that would function as reasonably expected by consumers and in accordance with industry standards. Such representations formed the basis of the bargain in Plaintiff's and New York Class members' decisions to purchase or lease the Class Vehicles.

184.   Even though privity is not required or a third-party beneficiary exception exists, Plaintiffs are in privity with Ford because Ford marketed the Class

Vehicles to Plaintiff and New York Class Members, and Plaintiff and New York Class Members were the intended users of the vehicles.

185. Ford knew or had reason to know of the specific use for which Plaintiff and New York Class Members purchased their Class Vehicles.

186. Because of the Valvetrain Defect, the Class Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

187. Ford knew about the defect in the Class Vehicles, allowing Ford to cure their breach of warranty if it chose to do so.

188. Plaintiff and New York Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations because of Ford's conduct described herein. Affording Ford a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

189. Ford was provided notice of the Valvetrain Defect through numerous complaints filed against it directly and through its dealers.

190. Notice can be further imputed from Ford's decision to alter its manufacturing processes.

191.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the New York Class have been damaged in an amount to be proven at trial.

### COUNT VII
### Breach of Express Warranty
### N.Y. U.C.C. §§ 2-313 and 2-A-210

192.   Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

193.   The New York Plaintiff (referred to simply as "Plaintiff" in the remainder of this count) brings this Count individually and on behalf of the other members of the New York Class.

194.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. U.C.C. §§ 2-104(1) and 2-A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

195.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.Y. U.C.C. § 2-A-103(1)(p).

196.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. § § 2-105(1) and 2-A-103(1)(h).

197.   In its warranty, Ford expressly warranted that it would repair or replace any part that is defective in material or workmanship under normal use.

40

198. The Ford Warranty further states that all repairs/replacements made under the warranty are free of charge.

199. Ford's Warranty formed the basis of the bargain that was reached when Plaintiff and the other New York Class Members purchased or leased their Class Vehicles with the Valvetrain Defect.

200. Ford breached the express warranty to repair parts defective in material or workmanship by failing to repair the Valvetrain Defect.

201. Ford has not repaired, and has been unable to repair, the Valvetrain Defect in Plaintiff's Class Vehicle and the Class Vehicles of the other New York Class Members.

202. Ford was provided notice of the Valvetrain Defect through numerous complaints filed against it directly and through its dealers.

203. Notice can be further imputed from Ford's decision to alter its manufacturing processes.

204. The Ford Warranty therefore fails in its essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiff and the other New York Class Members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

205.   Any attempt to present the Class Vehicles for repair would have been futile because any ensuing repair would have been inadequate, based on Ford's demonstrated inability or refusal to make effective repairs.

206.   Accordingly, recovery by Plaintiff and the other New York Class Members is not limited to the limited warranty of repair/replacement, and Plaintiff, individually and on behalf of the other New York Class Members, seeks all remedies as allowed by law.

207.   Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Ford improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other New York Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

208.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Ford's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other New York Class Members' remedies would be insufficient to make Plaintiff and the other New York Class Members whole.

209.   As a direct and proximate result of Ford's breach of express warranty, Plaintiff and the other New York Class Members have been damaged in an amount to be determined at trial.

210.   Plaintiff seeks all available relief under this cause of action.

## COUNT VIII
### Breach of Express Warranty

211.   Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

212.   Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class and each of their respective state subclasses.

213.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles and a "seller" of motor vehicles under each states' applicable laws.

214.   With respect to leases, Ford is and was all relevant times a "lessor" of motor vehicles under each state's applicable laws.

215.   The Class Vehicles are and were at all relevant times "goods" within the meaning of each states' applicable laws.

216.   In its warranty, Ford expressly warranted that it would repair or replace any part that is defective in material or workmanship under normal use.

217.   The Ford Warranty further states that all repairs/replacements made under the warranty are free of charge.

218.   Ford's Warranty formed the basis of the bargain that was reached when Plaintiffs and the other Class Members purchased or leased their Class Vehicles with the Valvetrain Defect.

219.   Ford breached the express warranty to repair parts defective in material or workmanship by failing to repair the Valvetrain Defect.

220.   Ford has not repaired, and has been unable to repair, the Valvetrain Defect in Plaintiffs' Class Vehicle and the Class Vehicles of the other Class Members.

221.   Ford was provided notice of the Valvetrain Defect through numerous complaints filed against it directly and through its dealers.

222.   Notice can be further imputed from Ford's decision to alter its manufacturing processes.

223.   The Ford Warranty therefore fails in its essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiffs and the other Class Members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

224.   Any attempt to present the Class Vehicles for repair would have been futile because any ensuing repair would have been inadequate, based on Ford's demonstrated inability or refusal to make effective repairs.

225.    Accordingly, recovery by Plaintiffs and the other Class Members is not limited to the limited warranty of repair/replacement, and Plaintiffs, individually and on behalf of the other Class Members, seek all remedies as allowed by law.

226.    Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Ford improperly concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class Members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

227.    Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Ford's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class Members' remedies would be insufficient to make Plaintiffs and the other Class Members whole.

228.    As a direct and proximate result of Ford's breach of express warranty, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial.

229.    Plaintiffs seek all available relief under this cause of action.

## COUNT IX
### Breach of the Implied Warranty of Merchantability

230.   Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

231.   Plaintiffs bring this cause of action individually and on behalf of the nationwide class and each of their respective state subclasses.

232.   Ford is a merchant with respect to the Class Vehicles, as that term is used in each states' applicable laws.

233.   The Class Vehicles are goods as that term is used in each states' applicable laws.

234.   Plaintiffs and Class Members are buyers and Ford is a seller as those terms are used in each states' applicable laws.

235.   Plaintiffs purchased their Class Vehicle from Ford and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

236.   Even though privity is not required or a third-party beneficiary exception exists, Plaintiffs are in privity with Ford because Ford marketed the Class Vehicles to Plaintiffs and Class Members and Class Members were the intended users of the vehicles.

237.   Ford breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and were not

fit for the ordinary purposes for which such goods were used, as further alleged herein.

238.   Ford has actual knowledge of the Valvetrain Defect as alleged herein, satisfying any notice requirement. Moreover, due to Ford's failure to remedy the Defect, any notice requirement is futile.

239.   The Ford Warranty fails in its essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiffs and the other Class Members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the limited warranty period.

240.   Plaintiffs allege that Ford breached the implied warranty of merchantability and/or the implied warranty of fitness for a particular purpose.

241.   Ford was aware of remote customers' requirements that the Class Vehicles would work safely and was aware that remote customers generally expected the Class Vehicles to meet minimum standards.  The Class Vehicles do not reliably work safely and do not meet minimum standards due to the Defect alleged here.

242.   As a direct and proximate result of the Valvetrain Defect, Plaintiffs have not appreciated the benefit of his bargain and has suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

243. Plaintiffs seek all available relief under this cause of action.

## COUNT X
## Fraudulent Concealment/Omission

244. Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

245. Plaintiffs bring this cause of action individually and on behalf of the nationwide class and each of their respective state subclasses.

246. Ford was aware of the Valvetrain Defect when it marketed and sold the Class Vehicles to Plaintiffs and the other Class Members.

247. Having been aware of the Valvetrain Defect and having known that Plaintiffs and the other Class Members could not have reasonably been expected to know of this Defect, Ford had a duty to disclose the Valvetrain Defect to Plaintiffs and the other Class Members in connection with the sale or lease of the Class Vehicles.

248. Further, Ford had a duty to disclose the Valvetrain Defect because disclosure of the Valvetrain Defect was necessary to dispel misleading impressions about the Class Vehicles' safety that were or might have been created by partial representation of the facts. Specifically, Ford promoted, through its advertisements available to all Class Members, that the vehicles were safe and dependable.

249. Ford did not disclose the Valvetrain Defect to Plaintiffs and the other Class Members in connection with the sale or lease of the Class Vehicles.

250.   For the reasons set forth above, the Valvetrain Defect comprises material information with respect to the sale or lease of the Class Vehicles.

251.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class Members reasonably relied on Ford to disclose known material defects with respect to the Class Vehicles.  Had Plaintiffs and the other Class Members known of the Valvetrain Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

252.   Ford's deceptive omissions constitute an independent tort, separate of the breach of warranties alleged herein.

253.   Through its omissions regarding the Valvetrain Defect within the Class Vehicles, Ford intended to induce, and did induce, Plaintiffs and the other Class Members to purchase or lease a Class Vehicle that they otherwise would not have purchased, or to pay more for a Class Vehicle than they otherwise would have paid.

254.   As a direct and proximate result of Ford's omissions, Plaintiffs and the other Class Members either paid too much for the Class Vehicles or would not have purchased the Class Vehicles if the Valvetrain Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

255.   Plaintiffs seek all available relief under this cause of action.

## COUNT XI
**Unjust Enrichment**

256.   Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

257.   Plaintiffs bring this cause of action individually and on behalf of the nationwide class and each of their respective state subclasses.

258.   Ford has directly benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Ford's concealment of the Valvetrain Defect, and Plaintiffs and the other members of the Class have overpaid for these vehicles.

259.   Ford has received and retained unjust benefits from Plaintiffs and the other members of the Class, and inequity has resulted.

260.   Ford is not an innocent third party but instead directly benefited from the unlawful conduct alleged here.   Ford benefits financially from consumers purchasing the Class Vehicles. The relationship between Plaintiffs' and Class Members detriment and Ford's benefit flows from the challenged conduct alleged in this Complaint.

261.   It is inequitable and unconscionable for Ford to retain these benefits.

262.   Because Ford concealed its fraud and deception, Plaintiffs and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Ford's misconduct.

263.   Ford knowingly accepted the unjust benefits of its wrongful conduct.

264.   As a result of Ford's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the other members of the Class in an amount to be proven at trial.

265.   Plaintiffs and Class Members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

266.   Plaintiffs seek all available relief under this cause of action.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully requests that the Court enter judgment in their favor and against Defendant, Ford Motor Company, as follows:

1. Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

2. Ordering Ford to pay actual and statutory damages (including punitive damages) and restitution by way of judgment to Plaintiffs and the other Class Members, as allowable by law;

3. Ordering Ford to pay both pre- and post-judgment interest on any amounts awarded;

4. Ordering Ford to pay attorneys' fees and costs of suit; and

5. Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED:  December 12, 2024       Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone: 248-841-2200
epm@millerlawpc.com
dal@millerlawpc.com

Adam J. Levitt
John E. Tangren
Daniel R. Ferri
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

Joel D. Smith
**SMITH KRIVOSHEY, PLLC**
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail:  joel@skclassactions.com

Yeremey O. Krivoshey
**SMITH KRIVOSHEY, PLLC**
166 Geary Street, Ste. 1500-1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail:  yeremey@skclassactions.com

*Counsel for Plaintiffs and the*
*Proposed Classes*