UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **MATTHEW BARKUS, DANIEL SILBERMAN, and KATRINA MILLER, individually and on behalf of all others similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**FORD MOTOR COMPANY,**<br><br>Defendant. | **2:24-CV-13310-TGB-DRG**<br><br>HON. TERRENCE G. BERG<br><br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**<br>**(ECF NO. 22)** |

Presently before the Court is Defendant Ford Motor Company's Motion to Dismiss Plaintiffs' First Amended Class Action Complaint ("FAC"). ECF No. 22. The Court heard oral argument on January 28, 2026. ECF No. 32. For the following reasons, Defendant's Motion to Dismiss will be **GRANTED**.

## I.  BACKGROUND

### A. Complaint

Defendant Ford Motor Company ("Ford" or "Defendant") is a Michigan corporation with its corporate headquarters located in the Eastern District of Michigan. FAC, ECF No. 19, ¶ 15. Ford is responsible for the manufacturing, sales, marketing, service, distribution, import, and export of the vehicles at issue. *Id.* at ¶ 52. Plaintiffs Matthew Barkus,

Daniel Silberman, and Katrina Miller seek damages and equitable relief, individually and on behalf of all other Class Members, for Ford's alleged sale and lease of certain Ford vehicles equipped with 2.7L or 3.0L "EcoBoost" engines containing intake valves made out of "Silchrome Lite," which suffered "from a structural defect in their valvetrains that makes the vehicles susceptible to catastrophic engine failure, exposing occupants to great risk of bodily harm." *Id*. at ¶ 1.

Specifically, Plaintiffs allege that consumers of the Class Vehicles[1] began to experience vehicle failure as a result of the Valvetrain Defect soon after purchasing their Class Vehicles. *Id*. at ¶ 8. Plaintiffs allege that the intake valves inside the engines are manufactured out of an alloy known as "Silchrome Lite," which they allege is "a material that becomes excessively hard and brittle if exposed to over-temperatures during the machining of the component." *Id*. at ¶¶ 3, 77. According to the FAC, the "structurally-compromised intake valves cannot withstand the pressures placed upon them and risk fracturing." *Id*. at ¶ 4. When the intake valves

---

[1] Plaintiffs seek to represent a Nationwide Class, Multi-State Consumer Protection Class, New York Class, Pennsylvania Class, and Missouri Class. Furthermore, the affected class of vehicles with the alleged defect include the Ford Bronco (model year 2022); the Ford F-150 (model year 2021-2022); the Ford Edge (model year 2021-2022); the Lincoln Nautilus (model year 2021-2022); the Ford Explorer (model year 2021-2022); and the Lincoln Aviator (model year 2021-2022). FAC, ¶ 2. Defendant correctly points out that the Class Vehicles do not include Ford Bronco model year 2021, but the allegations in the Complaint plainly allege the 2021 Ford Bronco as one of the vehicles at issue.

fracture, "the consequence can be sudden, catastrophic engine failure and a loss of motive power," posing a "high risk of injury" to the driver, passengers, and those in the immediate surrounding, and requiring "a full engine replacement." *Id.* at ¶¶ 5-6, 77.

In support of its allegations, Plaintiffs' Complaint quotes from three customer complaints sent to the National Highway Traffic Safety Administration ("NHTSA") in March 2022 complaining about the defect, raising questions about the integrity and safety of the 2021 Ford Bronco, and requesting an investigation. *Id.* at ¶¶ 9, 65; *see also* Exhibit 1, ECF No. 19-2 (dated March 17, 2022); Exhibit 2, ECF No. 19-3 (dated March 18, 2022); Exhibit 3, ECF No. 19-4 (dated March 29, 2022). The letters, which are nearly identical, allege that as of the date of their writing, 35 people had filed complaints about the issue on NHTSA's website. FAC, ¶ 67. Using almost the exact same words, the three letters stated that the defect posed:

> [A] major safety issue in that the catastrophic engine failure has already left hundreds of people stranded on roadways nationwide. Some have barely avoided major injury when their vehicles have had complete power loss at freeway speeds in traffic, others in the middle of busy intersection with no ability to get out of harms [sic] way, and still others have been stranded for hours in freezing conditions waiting for help. . . . Please initiate an investigation into this known defect so that we may prevent serious injury or possible death.

*Id.* at ¶¶ 68-70; Exhibits 1-3, ECF No. 19, PageID.279-89.

3

Plaintiffs also attached to the Complaint some of NHTSA's public records regarding actions taken in response to customer complaints. Those records indicate that eventually, on May 27, 2022, NHTSA's Office of Defects Investigation ("ODI") opened a "Defect Petition" investigation ("DP-22-001") to "evaluate the issue and determine whether to grant or deny the petitions." Exhibit 4 (DP-22-001), ECF No. 19-5, PageID.292; FAC, ¶¶ 10, 71. The ODI referred to 29 additional complaints and described the problem as follows:

> Under normal driving conditions without warning the vehicle may experience a loss of motive power without restart due to catastrophic engine failure related to a faulty valve within 2.7 L Eco-Boost Engines.

Exhibit 4, ECF No. 19-5, PageID.292; FAC, ¶¶ 72, 85. NHTSA's records attached to the Complaint also indicate that on June 7, 2022, Ford informed ODI that the alleged loss of motor power was "a result of catastrophic engine failures due to the engine valves failing," the root cause being the "valve 'keepers' not holding the retainer in place allowing the valve spring to detach from the valve resulting in interference between the valve and piston," which may "cause an engine lockup." Exhibit 5 (PE-22-007), ECF No. 19-6, PageID.294.

On July 22, 2022, ODI granted the petition and opened a "Preliminary Evaluation" (PE-22-007) "to assess the scope, frequency, and potential safety-related consequences of the alleged defect. *Id.*; FAC,

¶ 73. As part of the Preliminary Evaluation, Ford identified 328 additional customer complaints (including field reports), 487 warranty claims, and 809 engine exchanges relating to Ford models equipped with 2.7 L EcoBoost engine reporting engine failure with the most common consequence being loss of motive power while the vehicle is in motion. Exhibit 6 (EA-23-002), ECF No. 19-7, PageID.298.

During ODI's Preliminary Evaluation, "multiple contributing factors were identified which can lead to the fracturing of the intake valves in the subject engines." FAC, ¶ 77 (quoting Exhibit 6 (EA-23-002), ECF No. 19-7, PageID.298). Ford acknowledged that a fractured intake valve can result in catastrophic engine failure and a loss of motive power and noted that following a valve fracture, a vehicle typically requires a full engine replacement. *Id*. Ford advised ODI that "the defective valves were manufactured out of a specific alloy known as 'Silchrome Lite', which can become excessively hard and brittle if an overtemperature condition occurs during machining of the component." *Id*. Ford also identified that "the defective intake valves commonly fail early in a vehicle's life and has suggested that the majority of failures have already occurred." *Id*.

On September 29, 2023, ODI opened an Engineering Analysis ("EA-23-002") to evaluate the scope and frequency of allegations across an expanded scope to include Ford vehicles equipped with the 2.7 L as well as 3.0 L Nano EcoBoost Engine. Exhibit 6 (EA-23-002), ECF No. 19-7,

PageID.298. ODI estimated the number of potentially affected vehicles was 708,837. *Id.* at PageID.297. The Engineering Analysis also purported to evaluate the effectiveness of Ford's manufacturing improvements regarding the alleged defect. *Id.* at PageID.298. Indeed, the Complaint alleges that in October 2021, Ford stopped manufacturing valves made out of "Silchrome Lite," opting instead for a different alloy, allegedly more resilient, known as "Silchrome 1." FAC, ¶ 7. The ODI describes that "[a] design modification was implemented in October 2021, which changed the intake valve material to a different alloy known as 'Silchrome 1', that is less susceptible to over-temperature during machine grinding." Exhibit 6 (EA-23-002), ECF No. 19-7, PageID.298.

Plaintiffs now complain that "Ford has yet to provide an adequate remedy, such as a replacement of their defective valves, or compensate consumers for the amount they overpaid for these defective vehicles." FAC, ¶ 11. They complain that they "unwittingly paid [more] for a vehicle with an undisclosed and significant safety defect . . . than they would have paid had they known about the Valvetrain Defect." *Id.* at ¶¶ 13, 94. They allege Ford concealed the material fact of the Valvetrain Defect and Ford had a duty to disclose the Defect because it involves an unreasonable safety risk. *Id.* at ¶¶ 95, 100.

Plaintiff Silberman owns a 2021 Ford Bronco equipped with a 2.7L EcoBoost engine, which he bought new in January 2022 from Sayville Ford, a Ford dealership in Sayville, New York. FAC, ¶¶ 30-32. Plaintiff

Miller owns a 2021 Ford Bronco equipped with a 2.7L EcoBoost engine, which she purchased certified pre-owned in June 2023 from Suntrup Ford, a Ford dealership in St. Louis, Missouri. *Id.* at ¶¶ 41-43. Plaintiff Barkus owns a 2021 Ford F-150 equipped with a 2.7L EcoBoost engine, which he purchased certified pre-owned in August 2024, from Fred Beans Ford, an authorized Ford dealership in Newtown, Pennsylvania. *Id.* at ¶¶ 19-21. The Complaint alleges that all three vehicles were manufactured before October 2021. *Id.* at ¶¶ 20, 31, 42.

**B. NHTSA Investigation**

While the Complaint's allegations and attachments only include investigation material up until September 2023, both Ford and Plaintiffs attached supplemental material related to ODI's investigation in their motion and response.[2] The investigation alleges additional facts described below.

The NHTSA's public records show that field reports of Class Vehicles with fractured intake valves began as early as October 6, 2020, global warranty claims as early as February 13, 2021, and customer

---

[2] The parties admitted in their briefs as well as during oral argument that because the exhibits attached to the Complaint, to Defendant's Motion to Dismiss, and to Plaintiffs' Response are part of NHTSA's publicly available records, the Court can take judicial notice of them at this motion-to-dismiss stage. *See Sharp v. FCA US LLC*, 637 F. Supp. 3d 454, 459 (E.D. Mich. Oct. 25, 2022)(Parker, J.) ("[W]hen deciding a motion to dismiss, a court may consider materials outside the pleadings that 'are referred to in the complaint and are central to the claims contained therein.'").

reports as early as March 31, 2021. Exhibit A, ECF No. 23-1, PageID.339. According to ODI, "Ford began investigating the subject defect in July 2021, determined the root cause, and took corrective measures for the new production vehicles." ECF No. 30-3, PageID.442. While analysis of the failure report data demonstrates that these corrective actions were successful in eliminating the risk of intake valve fracture for subject vehicles produced after October 2021, Ford did not take any field action to address vehicles produced prior to the corrective actions, and in the several months following the implementation of the production changes, a significant number of field failures continued to occur. *Id.*

According to Ford's chronology of defect determination, on January 25, 2022, Ford's Global Critical Concern Review Group ("CCRG") opened an investigation after 22 instances of engine failure at 3 months of service or less. Exhibit A, ECF No. 23-1, PageID.398. A review of failed engines revealed at that time that the engine intake valves fractured and fell into the combustion chamber of the engine causing catastrophic engine damage leading to a Loss of Motive Power ("LOMP"). *Id.* Based on an analysis of returned fractured valves from failed engines, Ford identified that the potential root cause of the failures was engine intake valve failure due to valves that exceeded the designed specification for hardness, were brittle, and more likely to fracture. *Id.* Ford determined that this was due to the *supplier's* grinding processes and the sensitivity of the intake valve material to grinding processes that were not within

8

control specifications. *Id*. The intake valve material was changed for vehicles produced after October 31, 2021. *Id*. The new material increased the valve's robustness to keeper groove grinding processes outside of control specifications. *Id*.

On May 5, 2022, Ford's North America CCRG opened an investigation regarding early time in-service engine intake valve fractures on certain vehicles equipped with 2.7L and 3.0L Nano EcoBoost gasoline engines, which confirmed intake valve fracture on 251 engines from warranty repairs. *Id*.

As alleged in the Complaint, eventually, on May 27, 2022, ODI opened a "Defect Petition" investigation ("DP-22-001") in response to an increasing number of customer complaints alleging loss of motive power as a result of catastrophic engine damage in 2021 Model Year Ford Bronco. *Id*.; ECF No. 19-5, PageID.292. On June 7, 2022, Ford informed ODI that the alleged loss of motor power was "a result of catastrophic engine failures due to the engine valves failing," the root cause being the "valve 'keepers' not holding the retainer in place allowing the valve spring to detach from the valve resulting in interference between the valve and piston," which may "cause an engine lockup." Exhibit 5, ECF No. 19-6, PageID.294; Exhibit A, ECF No. 23-1, PageID.398. On July 22, 2022, ODI granted the petition and opened a "Preliminary Evaluation" (PE 22-007) to continue their investigation into the customer allegations of LOMP. Exhibit A, ECF No. 23-1, PageID.398. Ford's response to the

9

Preliminary Evaluation was provided on September 28, 2022. *Id.* As further explained in NHTSA's public records not attached to the Complaint, during PE22007, ODI noted that,

> [T]he cause of engine failure and loss of motive power in the subject vehicles was determined to be intake valve fracture, and the full scope of vehicles affected by the subject defect was identified as all MY 2021-2022 Ford and Lincoln models equipped with either the 2.7L or 3.0L EcoBoost engines, referred to as the "Nano" engine family. If an intake valve fractures in the subject engines, it may drop into the cylinder and contact the piston, often resulting in catastrophic engine damage.

ECF No. 30-3, PageID.442.

On September 29, 2023, ODI opened an "Engineering Analysis" (EA-23-002) and expanded the scope of its investigation to include Ford vehicles equipped with the 3.0 L Nano EcoBoost Engine. Exhibit 6, ECF No. 19-7, PageID.298. As a result of the Engineering Analysis, ODI noted that,

> Forensic analysis of fractured intake valves demonstrated that the defective components exhibited "grinding burn" or out of specification hardness in the area of the keeper grooves. The presence of grinding burn is evidence that during the groove grinding phase of production, the temperature of the valve became sufficiently high to alter the microstructure of the material and is indicative that the valve supplier's manufacturing processes were not within control specifications. Grinding burn results in a hard, brittle microstructure and high residual stresses toward the surface of the valve. Through normal engine loading, a valve with grinding burn will likely fracture at the area of highest vulnerability, which is the third keeper groove.

ECF No. 30-3, PageID.442.

Ford responded to the Engineering Analysis on January 2, 2024. In its response to the EA-23-002 Information Request, Ford provided evidence of 396 customer complaints (including field reports), 825 warranty claims, and 936 engine exchanges. ECF No. 30-3, PageID.442. Ford observed that there was a "higher than ambient level of repairs observed" for vehicles produced between May 1 and October 31, 2021. Exhibit A, ECF No. 23-1, PageID.398. The ODI stated that,

> When considering both ODI and manufacturer failure report data, there have been reports representing 1066 unique vehicles within the subject vehicle population. Analysis of the failure report data demonstrates that vehicles equipped with potentially defective intake valves were built within a production "spike period" of May 2021 – October 2021. The beginning of the spike period corresponds to a ramp up in production at the valve supplier manufacturing facility, and the end of the spike period aligns with the implementation of several mid-production process improvements and the decision to change the metal alloy used to produce intake valves from "Silchrome Lite" to "Silchrome 1".

ECF No. 30-3, PageID.442. The ODI reports that "analysis of the failure report data demonstrates that these corrective actions were successful in eliminating the risk of intake valve fracture for subject vehicles produced after October 2021." *Id.* In fact, the rate of reported failures related to the subject defect has steadily decreased since November 2021. *Id.*

The ODI also reports that "[i]t is Ford's assessment that not all valves produced during the spike period are defective, and that failures

11

associated with the subject defect occur at low time in service." *Id.* Further, the ODI states that "[a]nalysis of the failure report data demonstrates that the vast majority of failures have occurred before 20,000 miles with over half of all reported failures occurring before 5,000 miles." *Id.* The ODI coordinated with NHTSA's National Center for Statistics and Analysis ("NCSA") to conduct statistical analysis and predict the number of future failures associated with the subject defect. *Id.* The ODI concludes that "[t]he results of this analysis, and the trends identified through the failure report data are generally consistent with Ford's assessment that defective intake valves will likely fail at a low time in service and indicate that the majority of subject vehicles equipped with defective valves have already experienced a failure." *Id.*

As of August 9, 2024, Ford was aware of 811 global warranty claims confirmed or suspected to be related to fractured intake valves with report dates ranging from February 13, 2021 to June 3, 2024. Ford was aware of 267 field reports with report dates of October 6, 2020 to October 18, 2023. Ford was aware of 223 customer reports with report dates of March 31, 2021 to August 29, 2023. Exhibit A, ECF No. 23-1, PageID.398. Ford alleges it was not aware of any reports of accident or injury related to this condition. *Id.*

Thus, after receiving approval for a field action from Ford's Field Review Committee on August 16, 2024, Ford submitted recall 24V635 on August 23, 2024 for subject vehicles equipped with "Nano" engines and

built within the production spike period identified above. Exhibit A, ECF No. 23-1, PageID.398. The remedy included:

> [A]n inspection at a Ford/Lincoln dealership where the lifetime engine cycles of the vehicle will be determined. If a vehicle does not meet a threshold for lifetime engine cycles, the dealership will conduct a high RPM engine cycle accumulation procedure, which aims to identify if the vehicle is equipped with defective intake valves. Any vehicle that fails the accumulation procedure will receive an engine replacement under the recall.

> In addition to recall 24V635, Ford has stated that it will launch customer satisfaction campaign 24N12, which will provide extended warranty coverage to the subject vehicles through the earlier of 10 years or 150,000 miles.

ECF No. 30-3, PageID.442.

On August 23, 2024, when Ford submitted the recall, NHTSA estimated that 90,736 vehicles were "potentially involved," and that 1% of those vehicles were estimated to possess the valvetrain defect. ECF No. 30-2, PageID.435. The NHTSA described the defect and its cause as follows:

> Description of the Defect: The engines in affected vehicles may contain intake valves that have a propensity to crack and break. An engine intake valve that fails may lead to catastrophic engine damage resulting in a loss of motive power.

> Description of the Cause: The engine intake valves may have grinding burn and over-specification hardness.

*Id.* at PageID.438.

13

NHTSA expected to notify dealers of the recall on September 30, 2024, and to notify owners between October 7 and October 11, 2024. *Id.* at 438. On October 31, 2024, ODI closed the Engineering Analysis "[i]n view of the recall action being taken by Ford." ECF No. 30-3, PageID.442.

### C. Federal Suit

Plaintiffs filed the instant class action on December 12, 2024 (ECF No. 1) and amended the Complaint on April 25, 2025 (ECF No. 19). Defendant Ford Motor Company filed the pending Motion to Dismiss on May 23, 2025. ECF No. 22. The motion was fully briefed on September 30, 2025. *See* ECF Nos. 23, 24, 26, & 27. The Court heard oral argument on January 28, 2026. *See Tr.,* ECF No. 32.

## II.    LEGAL STANDARD

Against facial challenges to standing asserted under Rule 12(b)(1), a plaintiff must "clearly . . . allege facts demonstrating" each element of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "In reviewing a facial attack to a complaint under Rule 12(b)(1) for lack of standing, we must accept the allegations set forth in the complaint as true while drawing all inferences in favor of the plaintiff, just as we do in reviewing a 12(b)(6) motion to dismiss for failure to state a claim." *United States v. Michigan*, 2026 U.S. Dist. LEXIS 16590, *19 (W.D. Mich. Jan. 19, 2026) (citing *Hile v. Michigan*, 86 F.4th 269, 273 (6th Cir. 2023)).

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes courts to dismiss a lawsuit if they determine that the plaintiff has

14

"fail[ed] to state a claim upon which relief can be granted." In evaluating a motion to dismiss under Rule 12(b)(6), courts "must construe the complaint in the light most favorable to the plaintiff, accept all well-pled factual allegations as true and determine whether the plaintiff undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)). A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* (citation omitted). Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*

Consideration of a motion to dismiss under Rule 12(b)(6) is generally confined to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Courts may, however, consider any exhibits attached to the complaint, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss "so long as they are referred to in the Complaint and are central to the claims

15

contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (holding that allegations in attached exhibits are part of the complaint even if not alleged in the complaint). Furthermore, while Rule 201 of the Federal Rules of Evidence allows courts to take judicial notice of facts "at any stage of the proceeding" if the facts are "not subject to reasonable dispute," the contents of an administrative agency's publicly available files still "qualify for judicial notice, even when the truthfulness of the documents on file is another matter." *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1212–13 (10th Cir. 2012) ("All that matters is that materials *purporting* to identify a defect and to announce a recall are on file with NHTSA."). Therefore, at the motion-to-dismiss stage in this case, the Court must construe the complaint "in the light most favorable to the plaintiff, accept all well-pled factual allegations," including those in the complaint, as well as the exhibits attached to the complaint, motion to dismiss, and response, all of which the parties agree are publicly available, "as true" for the purpose of "determine[ing] whether the plaintiff undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief."

## III.   DISCUSSION

### A. "Overpayment" Standing Theory

To establish standing at the pleading stage, each plaintiff must "clearly . . . allege facts" demonstrating the "irreducible constitutional

16

minimum" of standing: that the plaintiff (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citations omitted). To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 339 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)); *see also Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) ("That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'") (citation omitted).

"[T]raditional tangible harms" such as "monetary harms" qualify as concrete injuries under Article III. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). "[R]ecently, [the Sixth Circuit] indicated that a plaintiff can suffer a concrete injury when he or she overpays for a defective product." *Ward v. J.M. Smucker Co.*, No. 24-3387, 2025 WL 2613489, at *2 (6th Cir. Sept. 10, 2025) (citing *Speerly v. Gen. Motors, LLC*, 143 F.4th

306, 314 (6th Cir. June 27, 2025) (en banc)).[3] But to establish standing under an overpayment theory, Plaintiffs "must allege facts sufficient to raise a 'plausible' inference of" a defective product. *Id.*; *see also Raymo*, 475 F. Supp. 3d at 696 ("Establishing an economic injury using

---

[3] The Sixth Circuit recently noted that the Seventh Circuit in *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 530 (7th Cir. 2024) explicitly "cabined overpayment-based injuries to exclude products containing only a 'potential risk of harm,'" while the Sixth Circuit has found that an overpayment theory can be a "sufficiently tangible and concrete harm to cross the Article III threshold." *See Speerly v. GM, LLC*, 143 F.4th 306, 314-315 (6th Cir. 2025); *see also Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 581 (6th Cir. 2013) (unpublished) ("Plaintiffs' allegation that they suffered a monetary loss by paying more for a cold remedy because of the company's misrepresentation establishes a cognizable injury [for purposes of Article III standing]."); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 1382297, at *5 (E.D. Mich. Apr. 18, 2017)(Lawson, J.) (citing *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013)) ("When a manufacturer sells a product that is defective, which causes consumers to be misled at the point of sale into paying more and getting less than they believed they were purchasing, the consumers suffer an injury in fact, even if that defect does not manifest itself in every individual unit."); *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 694 (E.D. Mich. July 30, 2020) ("The prevailing jurisprudence in this district . . . holds that a consumer who alleges she would not have purchased a vehicle (or would have paid less for it) had the manufacturer not misrepresented the vehicle to customers' detriment or omitted mention of its significant limitations, has alleged a plausible injury-in-fact."); *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1275 (E.D. Mich. Mar. 31, 2021) ("[T]his Court has recognized "overpayment" as a type of injury in this sort of situations[.]").

overpayment theory requires Plaintiffs to 'sufficiently and plausibly' plead the existence of a defect in [vehicles] they purchased or leased.").

Here, Plaintiffs allege that they suffered monetary harm in the form of overpayment for their vehicles allegedly containing a faulty valvetrain:

> Each purchaser or lessee of a Class Vehicle unwittingly paid for a vehicle with an undisclosed and significant safety defect. Each of these purchasers and lessees were damaged in that they paid more for their Class Vehicles than they would have paid had they known about the Valvetrain Defect or in that they would not have purchased or leased their Class Vehicles at all had they been informed of the Defect.

FAC, ¶ 13. This theory, however, presumes Plaintiffs' vehicles contain the alleged "undisclosed and significant safety defect." *Id.* Because they have not themselves experienced a manifestation of the defect, they must also "'sufficiently and plausibly' plead the existence of a defect in [the vehicles] they purchased." *See Raymo*, 475 F. Supp. 3d at 696.

Defendant does not deny that *some* vehicles contained the Valvetrain Defect, namely those manufactured between May 1, 2021 and October 31, 2021 (the "spike period"), all of which were subject to a recall. *See, e.g.*, ECF No. 32, PageID.553 ("We don't have a question as to whether there was a problem with some intake valves at some point because we have the recall that tells us that."). But Defendant argues Plaintiffs have not plausibly alleged that *their* vehicles, manufactured

19

before May 2021, also contain defective valves. Ford argues Plaintiffs have pled, "at most, only a hypothetical future injury," in that "they subjectively fear their vehicles might have a problem but offer no facts to substantiate that concern." ECF No. 22, PageID.328-29; *see Iqbal*, 556 U.S. at 678 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."); *Vonderhaar v. Village of Evendale*, 906 F.3d 397, 401 (6th Cir. 2018) (noting that an "allegation 'of *possible* future injury' is not enough," such that the injury "must be certainly impending" rather than based on a "highly speculative fear" of harm "at some future date").

Plaintiffs admit that they were not part of the recall and that they have not experienced the defect themselves.[4] But Plaintiffs argue the recall did not go far enough: Plaintiffs complain that Ford "has yet to declare a recall targeting *all* class vehicles affected by the Valvetrain

---

[4] Of note, Plaintiffs did not deny Defendant's allegation that the recall foreclosed any viable assertion of overpayment injury for vehicles in the recall population. *Sugasawara v. Ford Motor Co.*, 2019 WL 3945105, at *6 (N.D. Cal. Aug. 21, 2019) (no "plausible theory of economic loss" where plaintiffs did not "adequately allege that the [d]efect remain[ed] after the recall remedy"). To the extent vehicles in the recall population are presently within the definition of Plaintiffs' proposed classes, the definition of the class can be amended at class certification if the action survives. *See also Hadley v. Chrysler Grp., LLC*, 624 F. App'x 374, 379 (6th Cir. 2015) (finding case moot when "[t]here was never a dispute between the parties as to whether a safety defect exist[ed] in the vehicles or whether [the defendant] would repair that defect ... as [the defendant] acknowledged the safety defect in the recall notice and promised to repair it, for free, 'as quickly as possible'").

Defect," FAC, ¶ 78 (emphasis added), including the three named plaintiffs' vehicles manufactured before May 2021[5] which also contain valves made out of Silchrome Lite, *id.* at ¶¶ 20, 26, 31, 37, 42, 48. They allege it is *plausible* their valves are defective as well due to "defect in materials, workmanship, and/or design," *id.* at ¶ 63, based on (1) an unknown number of engine intake valve failure reports *before* May 2021, (2) ODI's finding that "multiple contributing factors . . . can lead to the fracturing of the intake valves in the subject engines," *id.* at ¶ 77, and (3) Ford's decision to change the intake valve material in October 2021, *id.* at ¶ 7.

### B. Design Defect Theory

Plaintiffs primarily rely on a design defect theory because "design defects[,] . . . by their nature, exist in all products 'possessing the faulty design." *Raymo*, 475 F. Supp. 3d at 692 (citation omitted). Plaintiffs state that valves, in general, must be able to withstand extreme conditions of the combustion chamber. FAC, ¶ 58. But they allege that Silchrome Lite is a "compromised material" that cannot withstand the pressure during regular operation of the vehicle, *id.* at ¶ 61, and that such "compromised intake valves" can seriously damage the integrity of the engine, *id.* at ¶¶ 59-60. Plaintiffs allege that their vehicles, and "[e]ach of the Class

---

[5] Plaintiffs did not deny Defendant's contention that their vehicles must have been manufactured prior to May 1, 2021 since they were not included in the recall. *See* ECF No. 22, PageID.325 n.2.

Vehicles[,] are equipped with either a 2.7L or a 3.0L EcoBoost engine containing intake valves made out of 'Silchrome Lite.'" *Id.* at ¶ 56.

Plaintiffs suggest that, taking as true Ford's assertion that the manufacturing process was defective *only* between May and October 2021, *something else* must explain the defect experienced in cars manufactured prior to the spike period. Indeed, Ford's own Recall Chronology, not attached to the Complaint, shows that Ford received an unknown number of reports of fractured intake valves as early as October 6, 2020, months before the vehicles subject to the recall were manufactured. Ex. A, ECF No. 23-1, PageID.399. Defendant responds that unspecific reports of fractured intake valves before the spike period are insufficient to "raise the reasonable inference that the [defect] was sufficiently extensive to plausibly affect any given product," *Smucker*, 2025 WL 2613489, at *3, because "[p]arts can break," and an "unspecific report that one part broke does not plausibly support even the existence of a defect." ECF No. 24, PageID.407.

Plaintiffs base their design defect theory on the allegation that in October 2021, Ford implemented a "design modification" including "several mid-production process improvements and decision to change the metal alloy used to produce intake valves from 'Silchrome Lite' to 'Silchrome 1.'" ECF No. 30-3, PageID.442. Plaintiffs allege Silchrome 1 is a "different, more resilient alloy that is less prone to fracture." *Id.* at ¶ 7. Indeed, the ODI noted that Silchrome 1 is *less susceptible to over-*

*temperature during machine grinding.*" Exhibit 6 (EA-23-002), ECF No. 19-7, PageID.298. But the alloy change does not make it plausible that the Silchrome Lite alloy *itself*, *alone*, is defective, because "multiple *contributing* factors . . . can lead to the fracturing of the intake valves in the subject engines." FAC, ¶ 77 (quoting Exhibit 6 (EA-23-002), ECF No. 19-7, PageID.298). That is why the "design modification" also included mid-production process improvements. And while it is possible Ford changed the material based on a design defect, it is possible "Ford made improvements as part of ongoing development of vehicles, which happens every day in manufacturing," ECF No. 32, PageID.544-45, or Ford changed the alloy because it found a material that was less prone to manufacturing error. In fact, Plaintiffs' own supporting material indicated that "[t]he new material increased the valve's robustness to keeper groove grinding processes *outside of control specifications.*" Exhibit A, ECF No. 23-1, PageID.398 (emphasis added). Thus, Plaintiffs do not allege facts to support that Silchrome Lite—in the absence of some manufacturing error—poses any risk of failure at all.

Furthermore, Plaintiffs' assertion that Silchrome Lite is a "compromised material that cannot withstand the intense pressures foisted upon intake valves during the regular operation of the vehicle" is speculative and unsupported. *See* FAC, ¶ 61. That there may be "contributing factors" beyond "over-temperature *during machine grinding*" (combination defect) does not support the bald allegation that

23

all Silchrome Lite valves cannot withstand regular pressure in the combustion chamber (standalone defect). The investigation indicates over-temperature during the manufacturing, not during regular driving, causes the valves to be brittle. It is not reasonable to infer that the over-temperature that could take place during the machining process is akin to the standard operating temperature in the combustion chamber. It would ignore the results of the investigation that the Court is to take as true at this stage,[6] as the parties admitted during oral argument. Indeed,

> Forensic analysis of fractured intake valves demonstrated that the defective components exhibited "grinding burn" or *out of specification* hardness in the area of the keeper grooves. The presence of grinding burn is evidence that *during the groove grinding phase of production, the temperature of the valve became sufficiently high to alter the microstructure of the material* and is indicative that the valve supplier's manufacturing processes were not within control specifications. Grinding burn results in a hard, brittle microstructure and high residual stresses toward the surface of the valve. *Through normal engine loading*, a valve with grinding burn will likely fracture at the area of highest vulnerability, which is the third keeper groove.

Exhibit A, ECF No. 23-1, PageID.398. Plaintiffs do not allege that *all* valves were subject to "over-temperature during machine grinding" and do not otherwise plausibly allege facts that suggest

---

[6] Defense counsel noted during oral argument that Rule 11's requirement that counsel make a reasonable inquiry into the facts and law of a case is violated when "Plaintiffs' own exhibits . . . refuted rather than supported the complaint's allegations." *King v. Whitmer*, 71 F.4th 511, 522 (6th Cir. 2023).

that Silchrome Lite—when not subjected to any manufacturing error—poses any risk of failure at all.

Therefore, based on the allegations in the Complaint and supporting documents attached to the Complaint, the valves made of Silchrome Lite cannot be said to be "per se defective because of the inherent potential for malfunction due to its design." *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1275 (E.D. Mich. Mar. 31, 2021). To the extent Plaintiffs allege Silchrome Lite is *always* compromised or structurally defective—as opposed to defective only when subjected to a defective manufacturing process, as further discussed below—they have not sufficiently and plausibly pled such a design defect.

## C. Manufacturing Defect Theory

Alternatively, though admittedly not Plaintiffs' primary theory,[7] the Complaint also alleges a manufacturing defect. As discussed above, Plaintiffs allege that,

---

[7] During oral argument, Plaintiffs' counsel stated that a manufacturing defect "[i]s not the defect that [they]'ve pled, to be clear." *Tr.*, ECF No. 32, PageID.565. But counsel later stated that "it could be either a defect in the material itself or a defect in the way that that material was machined, not just during that five-month window, but outside of it as well." *Id.* at PageID.567. Defendant asserted that "[b]y plaintiffs' own definition, the alleged defect involves a supplier's sporadic error during machine grinding that resulted in some valves being manufactured outside Ford's specifications." *See* Mot., ECF No. 22, PageID.344; *see also* Reply, ECF No. 24, PageID.404 (Plaintiffs "pled an alleged defect resulting from a transitory supplier manufacturing error").

25

> 3. "Silchrome Lite," [is] a material that becomes excessively hard and brittle if *exposed to over-temperatures during the machining of the component.*

> 77. ODI observed the following about the root cause of the Defect:

> > . . . Ford advised ODI that the defective valves were manufactured out of a specific alloy known as "Silchrome Lite", which can become excessively hard and brittle *if an overtemperature condition occurs during machining of the component."* . . .

> 82. Ford purposefully stopped using "Silchrome Lite" as early as October 2021. This "design modification," as explained in the ODI materials, "changed the intake valve material to a different alloy known as 'Silchrome 1,' that is *less susceptible to over-temperature during machine grinding."*

FAC, ECF No. 19 (emphasis added).

Unlike the design defect theory, these allegations are accompanied by factual support suggesting a manufacturing defect *can* cause the alloy to be subjected to over-temperatures during manufacturing, which can result in "structurally-compromised valves." *Id.* at ¶ 4. For instance, excerpts of the NHTSA's investigation attached to the Complaint indicate that Ford advised ODI that "the defective valves were manufactured out of a specific alloy known as 'Silchrome Lite', which can become excessively hard and brittle if an overtemperature condition occurs during machining of the component." ECF No. 19-7, PageID.298. Additional excerpts of the NHTSA investigation attached to Defendant's Motion to Dismiss similarly support the manufacturing defect theory:

26

> Forensic analysis of fractured intake valves demonstrated that the defective components exhibited "grinding burn" or out of specification hardness in the area of the keeper grooves. The presence of grinding burn is evidence that during the groove grinding phase of production, the temperature of the valve became sufficiently high to alter the microstructure of the material and is indicative that the valve supplier's manufacturing processes were not within control specifications. Grinding burn results in a hard, brittle microstructure and high residual stresses toward the surface of the valve. Through normal engine loading, a valve with grinding burn will likely fracture at the area of highest vulnerability, which is the third keeper groove.

ECF No. 30-3, PageID.443. And so do additional excerpts attached to

Plaintiffs' Response:

> Based on an analysis of returned fractured valves from failed engines, Ford identified that the potential root cause of the failures was engine intake valve failure due to valves that exceeded the designed specification for hardness, were brittle, and more likely to fracture. Ford determined that this was due to the supplier's grinding processes and the sensitivity of the intake valve material to grinding processes that were not within control specifications. The intake valve material was changed for vehicles produced after October 31, 2021. The new material increased the valve's robustness to keeper groove grinding processes outside of control specifications.

Exhibit A, ECF No. 23-1, PageID.398.

Plaintiffs rely on the evidence of the recall to allege that the valves

in their own vehicles—manufactured before May 2021—were defective.

But the investigation Plaintiffs attach led to the conclusion that cars

manufactured between May and October 2021—not those manufactured

27

earlier—should be subject to the recall. Furthermore, the Sixth Circuit has recently held that "[a] product recall, by itself, does not suffice to raise a plausible inference of [defect]." *Smucker*, 2025 WL 2613489, at \*3 (citing *Huertas v. Bayer US LLC*, 120 F.4th 1169, 1178 (3d Cir. 2024) ("[T]he 'mere fact that a product' purchased by plaintiffs 'was recalled' does not 'nudge' a claim of alleged contamination from 'conceivable to plausible.'")).

While the investigation concluded that only vehicles manufactured between May and October of 2021 were subject to the recall, Plaintiffs rely on Ford's own Recall Chronology which indicates that Ford had received some reports of fractured intake valves as early as October 6, 2020, months *before* the vehicles subject to the recall were even manufactured:

> As of August 09, 2024, Ford is aware of 811 global warranty claims confirmed or suspected to be related to fractured intake valves with report dates ranging from *February 13, 2021* to June 03, 2024. Ford is aware of 267 field reports with report dates of *October 06, 2020* to October 18, 2023. Ford is aware of 223 customer reports with report dates of *March 31, 2021* to August 29, 2023.

Ex. A, ECF No. 23-1, PageID.398-99 (emphasis added). Because the date ranges here overlap with the May to October of 2021 timeframe, when the overtemperature issue was occurring, and the number of reports received before May of 2021 is not specified, it is unknown how many reports were made of fractured valves prior to the recall date. It can be

28

reasonably inferred from this chronology that Ford knows of a number of global warranty claims related to fractured intake valves received between February 13, 2021 and May 1, 2021, before the vehicles in the spike period were manufactured. It also knows of field reports between October 6, 2020 and May 1, 2021. And it knows of customer reports between March 31, 2021 and May 1, 2021. But the *specific* number of claims, field reports, and customer reports regarding vehicles manufactured before May 1, 2021 is unknown.

During oral argument, Ford admitted that, while not taking a position on what caused the problem with the intake valves referenced in those earlier reports, "there's no such thing as a perfect part" and "it is possible to have a sporadic manufacturing problem" which "doesn't rise to the level of a defect, but just something wasn't made quite as well as the rest of the parts." ECF No. 32, PageID.576. And Ford admitted that, on a "one-off basis," "it could have happened" that some of the Silchrome Lite valves made prior to May 2021 were also "being over-machined in such a way that might make them brittle because of over-temperature." *Id.* at PageID.578. Thus, regarding the vehicles manufactured before May 2021, the complaint does allege it is *possible* that *some* valves were also subject to a similar manufacturing defect.

However, to state a plausible claim of a manufacturing defect, "mere possibility is not enough." *Smucker*, 2025 WL 2613489, at *3. In fact, in *Smucker*, the Sixth Circuit explained that:

> A product recall, by itself, does not suffice to raise a plausible inference of contamination. Plaintiffs allege that the FDA identified at least sixteen reported cases of salmonella infection and traced those infections to Smucker's Lexington facility, which indicates that some peanut butter products sold by Smucker were contaminated. Under these alleged facts, it is possible that one or more Plaintiffs purchased contaminated peanut butter. But mere possibility is not enough—the allegations must cross the line from possible to plausible. The facts alleged here do not raise the reasonable inference that the contamination was sufficiently extensive to plausibly affect any given product.

*Id.* (citations omitted). Similarly here, Plaintiffs' identification of an unspecific number of failure reports prior to May 2021 "indicates that *some* [vehicles] sold by [Ford] were [defective]," so that it was "possible that one or more Plaintiffs purchased [defective vehicles]." *Id.* But that is not enough: to allege standing under an overpayment theory without manifestation of the defect, Plaintiffs must offer allegations suggesting the manufacturing defect was "sufficiently extensive" or "widespread" to plausibly affect Plaintiffs' or the class vehicles. *Id.*

During oral argument, both parties relied on NHTSA's calculation that Ford had received a total of 1,066 unique complaints between October 6, 2020 and January 2, 2024. ECF No. 30-3, PageID.442. While the Complaint alleges that the total number of complaints was "unusually high relative to the total population of vehicles sold or leased," FAC, ¶ 88, Plaintiffs recognized it did not know how many of those complaints concerned vehicles manufactured before the spike period

30

started in May 2021, compared with those that were manufactured during that period. And both parties admitted they did not know how many of these reports related to valves made before or after May 2021. *See* ECF No. 32, PageID.556. The record relied upon by Plaintiffs demonstrates only that Ford received an unknown number of failure reports prior to May 2021—and the remaining question is whether those pre-spike reports were sufficiently widespread to reasonably infer a defect.

Plaintiffs argue that discovery is necessary to determine the statistical breakdown of failure rates between vehicles manufactured outside and inside the spike period. ECF No. 32, PageID.564, 570. They argue that they are entitled to discovery because it was plausible that hundreds (or a sufficient number to rise to the level of plausibility) of those reports were made starting in October 2020 regarding cars manufactured outside of the "spike period" which started seven months later, ECF No, 32, PageID.564, because "[f]or every complaint that a consumer files with NHTSA, a car manufacturer likely receives hundreds, or even thousands, of related warranty claims," FAC, ¶ 86. But while Plaintiffs repeatedly faulted Defendant for not citing a case in which hundreds of reports were deemed insufficient to establish standing, speculating that hundreds of reports were made regarding vehicles manufactured prior to May 2021 is surely insufficient. *See Norman v. FCA US, LLC*, 696 F. Supp. 3d 359, 368–69 (E.D. Mich. Sep.

31

30, 2023) (rejecting similar allegation that "[f]or every one complaint filed with NHTSA, FCA likely receives hundreds or thousands of related warranty claims" as speculative).

What NHTSA's public record shows, though, is that there was "a higher than ambient level" of complaints related to vehicles manufactured between May 1 and October 31, 2021 (the "spike period"). During oral argument, defense counsel clarified that Ford observed "an above-normal rate of breakage of problems, what's called a rate-based recall, where you look at rates of failures, and the rates increase during a period of time." ECF No. 32, PageID.546. He explained that the machining error happened "on a very small number of the parts," but "with an increased level of frequency," as opposed to "a broken part here or a broken part there," which "require[d] a deeper look and ultimately led to a recall." ECF No. 32, PageID.578-80.

What NHTSA's public record also shows, and what Plaintiffs ignore, is that even among the "spike" population, for whom there was a higher-than-average level of repairs, only 1% of the vehicles (1 in 100) were estimated to have the defect. *See* ECF No. 30-2, PageID.435 (estimating that 1% of the 90,736 "potentially involved" recalled vehicles possessed the defect). One percent of the recalled vehicles represents 0.22% of the *total* alleged population of vehicles manufactured with Silchrome Lite valves, or about 1 in 500 cars, that were estimated to have the defect. *See* ECF No. 30-3, PageID.441 (identifying a total number of

411,315 vehicles made with the Silchrome Lite valve).[8] Compared to the ODI's initial estimation of the total population, also alleged in the complaint, *see* FAC, ¶ 76, that would be 0.13% of the total alleged population, or 1 in 1,000 cars, that were estimated to be defective. Exhibit 6, ECF No. 19-7, PageID.297 (estimating 708,837 vehicles for MY 2021-2022 Ford Bronco, Edge, Explorer, and F-150 and Lincoln Aviator and Nautilus vehicles). The Sixth Circuit in *Smucker* positively discussed a Third Circuit case in which potential injury-in-fact was based, in part, on testing of recalled product samples, where the testing detected contamination in 12 of 13 samples (or 92%), among other data. *See* 2025 WL 2613489, at *3 (citing *Huertas*, 120 F.4th at 1178-79). By contrast, without more, an estimation that 1 in 100 of the recalled vehicles is defective, or 1 in 500 of the total vehicle population, does not nudge the possibility of defect in *any* given product to a plausibility. *See id.*; *see also Monostable*, 2017 WL 1382297, at *5 (allowing overpayment theory where the "models of cars" at issue had "a reputation for [breaking] with regularity" and "would be viewed by the car-buying public as risky and undesirable").

It would be unreasonable to infer that the alleged defect rate for vehicles produced before May 2021 would somehow be equal to or greater than the defect rate for the recalled vehicles. In fact, NHTSA's investigation indicates that by October 31, 2024, the ODI believed that

---

[8] The calculation is as follows: ((90,736 / 100) / 411,315) x 100 = 0.22.

"the majority of subject vehicles equipped with defective valves have already experienced a failure." ECF No. 30-3, PageID.442. And, given that both Ford and the ODI found that "defective intake valves will likely fail at a low time in service," it is even less plausible that the defect rate for cars manufactured before the spike period would suddenly rise beyond the 1% defect rate identified in the spike population. And in the complaint here, Plaintiffs never alleged the mileage of their five-year-old cars, which further discredits an inference that the defect is sufficiently widespread. Therefore, as Defendant stated during oral argument, there is no "basis to believe . . . that there was a recurrent or a substantial problem that affected more than just a vehicle here or a vehicle there." ECF No. 32, PageID.578-80.

Based on the foregoing, the Court concludes that Plaintiffs fail to plausibly plead the existence of a manufacturing defect in their own or the Class Vehicles sufficient to establish an economic injury under the overpayment theory. *See Raymo*, 475 F. Supp. 3d at 695–96. Without standing, the case must be dismissed for lack of Article III jurisdiction, and the Court cannot address Defendant's remaining arguments— though they would face a similar fate considering Plaintiffs' failure to plausibly allege defect in their own vehicle or a sufficiently widespread defect in the Class Vehicles.

Therefore, Defendant's Motion to Dismiss is **GRANTED**.

34

## IV.  CONCLUSION

For the reasons stated, Defendant's Motion to Dismiss is **GRANTED**. Plaintiffs' First Amended Complaint is **HEREBY DISMISSED WITHOUT PREJUDICE**. This Order closes the case.

**SO ORDERED**.

Dated: March 23, 2026          /s/Terrence G. Berg
                               TERRENCE G. BERG
                               UNITED STATES DISTRICT JUDGE